.. STATE OF IOWA, Appellee, v. NICK CHRIST, Appellant.

**HOMICIDE:** Nonpositive Identification of Accused. Evidence held
1 to sustain a verdict of guilt, even though the identification of the accused was not altogether positive.

**HOMICIDE:** Negativing Self-Defense. Circumstantial evidence re-
2 viewed, and held to negative a plea of self-defense.

**CRIMINAL LAW:** Failure to Call All Witnesses. The State is not
3 bound, on the trial of a criminal, to call every attainable witness; neither is the accused entitled to an instruction that the failure to call an attainable grand jury witness creates a presumption that the testimony of such omitted witness would be adverse to the State. Especially is this true when other witnesses testify to every fact immediately attending the commission of an offense which the omitted witness could testify to.

**CRIMINAL LAW:** Suggesting Conviction on Former Trial. It is
4 not error for the court to say to the jury "that, *by reason of a former trial,* the defendant cannot be convicted of murder in the first degree." Such expression does not, in effect, tell the

jury that the defendant has already been convicted of second-degree murder.

EVIDENCE: Res Gestae. Statement of a witness, material, and explanatory of circumstances immediately preceding a homicide and connected therewith, reviewed, and held to constitute a part of the *res gestae*.

TRIAL: Gambling on Result of Answers. Objections to questions · must be timely. A litigant may not gamble on the result of an answer—retain it if favorable, move to strike if unfavorable.

CRIMINAL LAW: Misconduct in Argument. The appellate court will not declare prejudicial a statement by the prosecutor in argument that defendant is "guilty as hell," when it appears that such claim of prejudice has been overruled by the trial court.

CRIMINAL LAW: Curing Error by Striking Testimony and by Instructions. Error, if any, in receiving testimony is cured by striking it from the record, and by pointed instructions to disregard it.

HOMICIDE: Self-Defense—Instructions. Instructions. reviewed, and held (1) not to turn the jury into a field of mere conjecture on the subject of self-defense, nor (2) to assume that deceased was not armed with a dangerous weapon.

CRIMINAL LAW: Inexplicit but Correct Instructions. Instructions inexplicit, but correct so far as they go, are sufficient, in the absence of a request for more explicit ones.

*Appeal from Dubuque District Court.*—D. E. MAGUIRE, Judge.

APRIL 13, 1920.

REHEARING DENIED JULY 6, 1920.

DEFENDANT was tried to a jury, and convicted of the crime of manslaughter, and judgment pronounced. Defendant appeals.—*Affirmed.*

*Frantzen, Bonson & Gilloon,* for appellant.

*H. M. Havner,* Attorney General, *B. J. Powers,* Assistant Attorney General, and *E. H. Willging,* County Attorney, for appellee.

PRESTON, J.—Defendant was accused of causing the death of one George Parlos, on September 30, 1918, by shooting. There were three bullet wounds in the body of deceased, in front and to the left: one near the
**1. HOMICIDE: nonpositive identification of accused.** collar bone, another an inch below the left nipple, and the third in the abdomen. No question is made but that the wounds were the cause of his death. The shooting occurred between 7 and 8 o'clock in the morning. We take it from the arguments that the principal ground relied upon for a reversal is the alleged insufficiency of the evidence to sustain the verdict, though other questions are argued. The question as to the sufficiency of the evidence was raised by motions for a directed verdict, at the close of the State's evidence and all the evidence; also by motion for new trial. There are 29 assignments of error. Some of them are wholly without merit. All have been considered, and those which seem to be the more important will be discussed.

1. The State's evidence is not denied by witnesses for the defendant. The only witnesses for defendant were a photographer who testified as to photographs taken by him and measurements of the upstairs rooms where the shooting took place and the distance from the building to the alley, which was 67 feet, and four witnesses under and with whom defendant worked in the roundhouse and shops, who testified as to his character for peaceableness.

At the outset, it may be well to describe the premises and the surroundings, in view of some of the questions argued. This may be more conveniently done by the plat, which is as follows:

SECOND FLOOR PLAN

As we understand the evidence, Maple Street is to the east, and the alley to the west. Mrs. Enos lived a short distance south. She was the mother of the wife of deceased. Evidently, the shooting took place in the southeast bedroom, "G." Such is the claim. The rooms are small. After the shooting, Parlos was seen hanging to the bannister, and Mrs. Enos went to him, and soon after, he was helped by his wife to the Enos yard, where he died. It is not shown who was in possession of or who occupied the rooms where the trouble occurred. Deceased and his wife at one time lived in the basement of the Enos place, but, at the time of the killing, they had been living in a box car. As we understand it, the railroad yards are not far from this property. There is a board fence between the Enos residence and the premises where the shooting took place, so that, to go to the deceased, Mrs. Enos had to go by the street or the alley. She went by the alley. In the plat, "A" is the platform upon which Parlos stood when first seen by Mrs. Enos. "B" represents the door with glass panels, through which Mrs. Enos says she heard Parlos talking in Greek to someone on the inside. The nature of the conversation is not disclosed. There were not many words spoken. The kitchen, "C," is connected with the trunk room, "E," by the door, "D." The trunk room, "E," was connected with the bedroom, "G," by the door, "F," which swung east, as indicated. There was no lock on this

door. The floor showed evidences of scuffling of feet. "H1" is a bullet hole, near the north wall and the door, which went straight into the floor. "H2" is a bullet hole 8 feet and 4 inches from the doorway. It is a glancing shot into the floor, and deflected towards the east. "H3" marks bullet holes, one in the east wall and one in the north wall. Seven empty cartridges were found on the floor in the room "G." These empty shells belonged to a 32-caliber automatic gun. The four shots in the floor and walls, together with the three wounds inflicted on the body of Parlos, account for the seven shells. The evidence is that bullets taken from body of deceased were such as were used in a 32-caliber automatic revolver, and were of the same caliber as a box of bullets found in one of the rooms where the shooting occurred. "K" is a door between room "G" and the bedroom to the north. This door was nailed shut. "L" is the only window in room "G," and is 12 feet from the ground on Maple Street.

At about 7 o'clock on the morning of September 30th, Eluis Parlos, wife of deceased, came into the home of her mother, Mrs. Enos, and left a small package, supposed to contain a lunch, on the cupboard, and left the room. Some time after this, within the next 45 minutes, as appellant contends,—though the time is not definitely fixed,—Mrs. Enos went outdoors to get water to use in combing her little girl's hair. She was getting her child ready for school. While she was in the back yard, deceased called to Mrs. Enos from the top of the stairs shown in the plat, and said, "Ma, come up here, and see for yourself." This was the first time deceased was seen that morning by any of the witnesses. Whether he came out of this upstairs apartment, or from some other place, does not appear. Mrs. Enos went to the stairway by way of the alley. At about the time she started from her home, or while on the way, she heard a sound like the crashing of glass. On reaching the top of the stairs, she saw deceased with a chair in his hand. He had smashed the door "B." When Mrs. Enos arrived at the landing, or at about that time, she heard the talking be-

fore referred to. Deceased forced his way into the kitchen
by battering down the door, which, it is claimed, had been
locked against him. After entering the kitchen, he pro-
ceeded to the door "D," which he broke through with the
chair. After deceased had broken through the door "D,"
he dropped the chair, and Mrs. Enos says she then saw her
daughter, Mrs. Parlos, in the trunk room. Her testi-
mony is:

"I saw her in the second room when he broke the second
door open. I saw Mrs. Parlos in front of the second door;
it was from the kitchen side in front of it."

She testifies she did not see the defendant there at that
time, or anybody except Parlos and the girl. After de-
ceased entered the trunk room, he passed from Mrs. Enos'
sight; for she says she then turned and started to go out
and downstairs. She went directly down the stairs, and
went right along till she got to her own yard. The shooting
took place after she started to go down the stairway. She
testifies that, when she got to the bottom of the stairs, Mrs.
Parlos was there with her, and Mrs. Enos went on around
to her own yard, she says, to look after her little sick girl
in the house. She came out of the house, and saw Parlos
hanging to the stairway, the bannister. He said for her to
bring him water. She took the wash dish, and went out
with it, full of water, to bathe his face. Mrs. Parlos had
assisted deceased from the stairway to Mrs. Enos' yard.
Mrs. Enos says that she saw deceased lying in the yard;
that she saw no other person in the yard at that time,
except Mr. and Mrs. Parlos and the folks that lived next
door; that she was excited. She was looking at his, Parlos',
features, when he was lying in the yard. At that time, she
says she saw a man running, with a gun in his hands.

"Q. Who was the man? A. Nick Christ. Q. Is this
the man you saw, that is sitting here in the court room?
A. Yes, sir. Q. Where did he go? A. He went between
the two buildings, and that is the last I seen of him."

She did not see him come down the stairs. When she
first saw him, he was running, running in the yard. With

reference to the railroad tracks, he was running west. When she first saw him, he was running in a westerly direction, then turned north between the buildings. After she brought Parlos the basin of water, he died. As near as she could tell, she heard three or four shots fired that morning; may have been more or less; she did not stop to count them; they were fired rapidly. The police came just before Parlos died. On cross-examination, she says:

"I think it was this defendant. Q. But you are not certain, are you, Mrs. Enos? You only think so, isn't that it? Isn't it a fact that you only think so? A. Well, I don't remember, but I think it was."

On re-examination, she was asked whether defendant was the man, and she said, "Yes, sir, I saw him running, with a gun in his hand." A search was made for Nick Christ by the police. On the second day of October, in company with Judge Bonson and an attorney from Chicago, he appeared at the police station, and gave himself into the custody of the police. The coroner examined the premises at about 8 o'clock. He seems to have been the first one, after the death of Parlos. He says there was a table in the kitchen, which showed that somebody had recently been having breakfast. There were cups and saucers, a fork, and a common kitchen knife on the table, and some chairs in the room. The cook stove was still warm. He did not see a butcher knife or a pocket knife. There were some trunks and clothes in the trunk room. He then went into the bedroom, "G." The bed looked as though it had been occupied that night. He noticed a wet spot in the bed. On the table in this room were two glasses. One had some beer in it. There was also a pint bottle, partly filled with whisky, and some empty beer bottles. He says he made a careful examination. The chief of police visited the rooms about 8:30 o'clock that morning. He testifies that, when he went there, he saw a butcher knife, a pocket knife, and a table knife on the table. It is argued by appellant that there is no evidence which connects the defendant with the offense, except the testimony of Mrs. Enos, and that her identification of

the person she says she saw running from the scene was not sufficient, because, at one point in her cross-examination, she said, "I think he is the one." She had testified in chief with more positiveness, and the answer just referred to was brought out on cross-examination, and in answer to a leading and persuasive question. In *State v. Porter*, 34 Iowa 131, 133, witnesses introduced their statements with similar expressions, and the court said:

"There is no rule of law which requires a witness to be absolutely positive in his statement of fact. The positive witness · is often entitled to less consideration than · the more cautious."

See, also, *Abbott v. Church*, 288 Ill. 91. (123 N. E. 306, 4 A. L. R. 975, and note).

The weight of the evidence of this witness was for the jury, and sufficient, if they believed her. In addition to this, the defendant's fleeing hurriedly from the scene, with a gun in his hand, and passing near the deceased lying on the ground in a helpless condition, and defendant's concealment, were proper circumstances, with others, to be considered by the jury as indicating guilt. It may be true that no person directly charged defendant with the commission of the crime as a reason for flight, but the circumstances just related, and all the circumstances in the case, were such as to charge him therewith: that is, from them, he had reason to believe he would be apprehended as the perpetrator of the crime. Flight has been held to be *prima facie* indicative of guilt. · *State v. O'Callaghan*, 157 Iowa 545, 554. We do not understand appellant to complain of the law as laid down by the court in regard to flight, except that they contend that there is no evidence of flight. It is further contended by appellant that the witness Mrs. Enos was not asked by the State to describe the kind of a gun she saw defendant have. The argument is that it may have been a shotgun, and that it should be shown that the gun was such a one as the bullets indicated was used. It could readily have been shown what kind of a gun it was, by simply asking the witness. Under defendant's theory, it

would have been a circumstance in his favor to have asked and shown that it was a shotgun, if such is the fact. But a pistol or revolver is quite commonly called a gun. Furthermore, if the jury believed that the defendant was the person who was seen in flight by Mrs. Enos, they must have found that defendant was the party who did the shooting, and was in the room where revolver bullets and cartridges were found. Under these, and all the circumstances, it would be a proper inference for the jury to believe that the gun was a pistol. Considering all the evidence and circumstances, we think there was a jury question, and that the verdict is sustained by the evidence.

2. It is contended by appellant that the evidence conclusively shows that the defendant, if it was the defendant, or whoever it was who did the shooting, was acting in self-defense. To this we cannot agree. The circumstances before set out, as to the breaking in of the door by deceased, and the position of the bullet holes, and so on, are relied upon to sustain the contention. At the most, it would be a jury question. The trial court submitted the question of self-defense to the jury. This is an affirmative defense, in a sense. The jury could have found that deceased, at the time of the shooting, was not armed. The evidence shows that he had dropped the chair in the trunk room; but whether defendant was in danger, or whether to his apprehension he was, and whether defendant was justified in using a deadly weapon in a deadly manner when his assailant was not armed, and the other elements going to make up the defense of self-defense, were questions for the jury. There was evidence that deceased, in breaking the door, was angry, and there was evidence tending to show a scuffle in the room where the shooting occurred. These matters were doubtless taken into consideration by the jury in arriving at a verdict of manslaughter.

2. HOMICIDE: negativing self-defense.

3. It seems to have been the desire of defendant that the State should have put the wife of deceased on the stand as a witness. It appears that she was a witness before the

grand jury. It was shown that she was

3. CRIMINAL LAW: failure to call all witnesses.

present at the trial. Appellant cites authority from other jurisdictions, holding that a prosecuting attorney may not select and call only such witnesses as are most favorable to the prosecution, where there are others who are in a position to know, and do, in fact, know, as much about the transaction, etc.; but these cases recognize that there are times when the State is not required to produce at the trial those who may be intimately acquainted with the facts. The authorities hold that the State is required to introduce proof of the whole transaction, but that it is not necessary to use all the witnesses, and that the State may have good reason to question the truthfulness of some of the witnesses. It is claimed by the State that there were improper relations between the wife of the deceased and the defendant, or whoever the party was in the rooms before .this trouble began, and they had reason to believe that she would shield herself from such an embarrassing situation, and would be unlikely to tell the truth about it. There is nothing to indicate that the State designedly omitted to prove any fact in regard to the killing. Under the evidence, Mrs. Parlos was not in the room where the shooting occurred, at the time it took place. The evidence before set out shows that, when last seen, she was in the trunk room, and that was before the shooting; and further, that she must have been on the stairway outside, when the shooting occurred. She had reached the foot of the stairway at the time her mother did; so it would appear that everything she could have testified to in regard to the shooting was testified to by her mother. We think the ruling is sustained by our own cases. *State v. Middleham,* 62 Iowa 150, 153; *State v. Dillon,* 74 Iowa 653, 655. It was said in the *Middleham* case, quoted in the *Dillon* case, that:

"The failure of the State to produce all witnesses who testified before the grand jury is not a wrong, and creates no presumption of wrong."

4. In connection with the last proposition, the defend-

ant asked an instruction which was refused, to the effect, in substance, that, if the State had proved that a witness was present, and in a position to have knowledge of the perpetrator of the act, and the name of such party was on the indictment, it should be considered by the jury as tending to show that her testimony would be adverse to the State. The discussion in Paragraph 3 of the opinion, and the holding that there is no presumption of wrong, dispose of the assignment of error in regard to the refusal to give such an instruction. But, for the other reasons given, we think there was no error at this point.

5.  The indictment charged murder in the first degree. The trial court said, in one of its instructions:

"That, by reason of a former trial, the defendant in this case cannot be tried or convicted for the crime of murder in the first degree, and you should in no manner consider the offense of murder in the first degree."

4. CRIMINAL
LAW: sug-
gesting con-
viction on
former trial.

The court instructed in regard to murder in the second degree and manslaughter. Appellant contends that this instruction was error, because it indirectly and inferentially told the jury that, on the former trial, defendant had been convicted of murder in the second degree. The facts in regard to the former trial and the alleged conviction are not pointed out in argument, and we do not find that there is any evidence in regard to this. We assume, from the arguments, that there was a prior conviction for second-degree murder, and a new trial granted for some reason. From the language used, a jury would not be likely to infer that defendant had been convicted of second-degree murder. We are unable to determine from the record just how the attention of the court was called to the matter, or whether he took notice of it himself. No complaint is made, of course, that the court did not submit the question of first-degree murder to the jury. It is possible that the court could have used some other language, such as that, under the record, the jury should not consider first-degree murder. But, after all, it was a matter of defense for the defendant

to show that he had been acquitted of the charge of murder in the first degree, and, had the court not instructed as he did, it would have been necessary for the defendant to prove that he had been acquitted of murder in the first degree. This he could only do by proving the former verdict; so that, had he done so, it would have called the attention of the jury more directly to the fact than did the court in its instruction. Furthermore, had the jurors had sufficient legal learning to reason the matter out, it is not likely that they would so lightly regard their own oaths that they would convict or be influenced because some other jury had rendered a certain verdict; and this is especially so when the verdict was not allowed to stand.

6. Error is assigned because of the ruling of the court in permitting Mrs. Enos to state that deceased called to her from the stairway landing, and that deceased said:

5. EVIDENCE: res gestae.

"Ma, come up here and see for yourself." It is argued that the statement was not made in the presence of the defendant, and is not binding upon him, and that it is not a part of the *res gestae*. There is no testimony in the record, unless it be by inference, as to what deceased wanted his mother-in-law to see. The record is:

"There was nothing else that occurred that attracted my attention particularly on that morning, after she [Mrs. Parlos] left, only her husband calling me up. Q. Just tell us how that was, and what was done at that time. A. Well, he says, 'Ma, come up here and see for yourself,' and I went up.

"Mr. Gilloon: We move that the answer be stricken out, unless it was in the presence of the defendant, as not binding on him,—I mean, in the presence and hearing of the defendant. We object to the question for the same reason.

"Court: Overruled. (Exception.)"

It will be observed that there was no objection to the question. It was as apparent when the question was asked, and before the answer, that the question was objectionable,

if it was objectionable, as later; because the
witness had stated, before this question was
put, that deceased was calling her up, and
she was then asked to state how it was. We
have often ruled that a party may not wait and take his
chances, and, if the answer is unfavorable, then object. The
objection was not timely. But can it be said that the state-
ment was not in the presence and hearing of the defendant?
At most, the deceased was not then more than about 20 feet
from the party who did the shooting, who, the jury has
found, was this defendant. They were much closer than
was Mrs. Enos. Naturally, deceased would speak louder in
calling to Mrs. Enos at a greater distance than he would to
the party in the room closer. The evidence shows that de-
ceased, from the same position on the landing, was, at about
the same time, talking through the door to the party inside.
We think the circumstances were such that it was for the
jury to say whether, under the conditions, the defendant
was in a position to hear. We think, too, that it was a part
of the transaction, and *res gestae*. It was not the relation
of a past event, with opportunity for fabrication. It was
before the shooting, and was the first thing to call Mrs.
Enos' attention to matters that immediately led up to the
shooting, and which were detailed by her. He called to
her to call her attention, and she then went over. It showed
the presence of deceased at that point, as the evidence of
Mrs. Parlos' leaving the lunch, nearly an hour before,
showed her presence in the vicinity of the transaction. The
whole tragedy occurred in the space of a few minutes. His
calling to Mrs. Enos was the cause of her going to him.
We said in *State v. Peffers,* 80 Iowa 580, 582:

"We think the testimony was properly admitted as a
part of the transaction which led to the killing of Cathers.
It explained, to some extent, his reason for being with
Mrs. Peffers when the affray occurred, and was so far a
part of the *res gestae* as to be competent. *State v. Cross,*
68 Iowa 186. It may be, as claimed, that it would naturally
be inferred from the remark of Cathers that he had been

<div style="margin-left:2em">
6. TRIAL:
gambling on
result of
answers.
</div>

invited by Mrs. Peffers to follow her, but the jury had be-
fore them all the facts upon which the remark was based,
and knew whether it was well founded."

We think there was no error at this point.

7.   It is contended by appellant that there was mis-
conduct on the part of the assistant county attorney in his
closing argument to the jury, in that he said that defendant
was as guilty as hell, and that he shot to
7. CRIMINAL          kill. We think it was not improper for coun-
LAW : mis-
conduct in          sel to draw his conclusion, from all the cir-
argument.
cumstances, that he shot to kill. It may be
we ought not to take the time or space to discuss this
question at any length, because there was no objection or
exception to the remark, and it appears that an affidavit,
or perhaps two, were filed by the State in resistance; but
the record as to the affidavits is not clear as to just when
they were filed, or whether they are a part of the record.
The trial court had the advantage in knowing what the real
situation was in this respect.   Doubtless, counsel for de-
fendant insisted to the jury, and gave their opinion, that
defendant was not guilty, and tried to convince the jury
that he was not.   There is no direct showing of that fact.
The trial court heard all the arguments, and, so far as we
know, may have concluded that the statement by the county
attorney was in answer to argument for defendant.   We
held, in *State v. Cameron,* 177 Iowa 379, 381, opinion by
Salinger, J., that it will be presumed, nothing appearing to
the contrary, that argument by a public prosecutor was a
legitimate response to an argument for the defendant.   At
any rate, the court was on the ground, and, in overruling
the motion for new trial, held that there was no prejudice.
*State v. Burns,* 119 Iowa 663.   In *State v. Shultz,* 177 Iowa
321, 326, it was held not erroneous for the prosecutor to
state that he had no doubt of defendant's guilt, which is
equivalent to saying that he believes, or is of opinion, that
defendant is guilty.   See, also, *State v. Peirce,* 178 Iowa
417, 440.   Appellant cites the *Peirce* case, at pages 443 and
444, as holding that, where the argument is clearly improper

and naturally prejudicial, no failure to object, nor act of the court, can be held to effectuate either waiver or cure. But, for the reasons given, that principle does not apply to the statement made in this case. .

8. In describing conditions in the room, some of the witnesses referred to a wet spot on a sheet on the bed, saying that it was about a foot across, and that, after it

8. CRIMINAL LAW: curing error by striking testimony and by instructions.

was dry, it was of a yellowish color. It is thought by appellant that this was prejudicial, for that it created an undue prejudice in the minds of the jury. Much of the evidence in regard to this went in without objection. It was all stricken out later, and the court in Instruction No. 34, specifically instructed the jury not to consider any evidence rejected or ruled out or stricken out, and that the jury should not allow any such rejected matters to make any impression upon their minds, or have any weight whatever in making up the verdict, but that they should decide the case from the evidence submitted alone, independent of all other consideration, and acting fairly and impartially, etc. We see nothing in this calculated to excite the passions of the jury. It was cured by striking it out, and by the instruction.

9. Many of the instructions are complained of. Some have already been noticed. The argument in regard to them is brief, and we think there is no substantial merit in the objections thereto, so that we shall notice

9. HOMICIDE: self-defense: instructions.

the complaints as briefly as may be. In one of the instructions on the subject of self-defense, the court said that the jury was to take into consideration "whether or not defendant was warranted in doing what you may find from the evidence he did do, at the time and place in question." It is complained that by this the court left it to the jury to guess and conjecture on what may have happened, instead of confining them to what the evidence in the case showed did happen. The court simply left it to the jury to determine what the defendant did, if he did anything, as shown by the evidence.

Had the court confined himself to telling the jury what did happen, as suggested, he would have assumed a fact as having happened. We do not understand this to be permissible in a criminal case.

By Instruction No. 9, in regard to circumstantial evidence, the court stated that there was no direct evidence,—that is, no evidence of eyewitnesses to the alleged shooting,—and that the State must rely upon circumstantial evidence. It is thought that this was erroneous, because there was an eyewitness, in the person of Mrs. Parlos. This has been disposed of by prior discussion.

Instruction No. 10 is complained of, for that it is thought that it assumes that defendant did take the life of Parlos. We do not so read the instruction. A sentence or clause is separated from the rest by the defendant, upon which the argument is based. The subject of the instruction is that, if the jury find from the evidence, beyond a reasonable doubt, that defendant took the life of Parlos, they should consider and determine whether or not, at the time, he was acting in self-defense, and that, in determining whether or not he was so acting in self-defense, the burden is not upon the defendant to so show, but was upon the State to show, beyond all reasonable doubt, that he was not acting in self-defense. Defendant was claiming self-defense at the trial, and is doing so here. We do not see how the court could have stated it differently. The court left it to the jury to determine whether defendant did take the life of Parlos, and then stated the law of self-defense. Some of the later instructions are complained of, for that it is thought that the State was relieved of proving that defendant was not acting in self-defense. The court had properly covered it once, and it was not necessary to repeat that statement in every other instruction on the subject.

After having left it to the jury to determine whether defendant did the shooting,—and the jury did so find, which would necessarily be a finding that the person in the room with whom Parlos was talking was the defendant,—the court said that no mere words would justify the de-

fendant in taking the life of Parlos, if the jury should find from the evidence that defendant did take his life. The jury was also told in this instruction that, if Parlos made an assault upon the defendant without a dangerous and deadly weapon, this would not justify the shooting, unless the attack was of such a character as to lead him, while acting as a reasonably prudent or cautious person, under similar circumstances, to believe that his own life was in danger, or that he was in danger of great bodily injury, etc. The complaint of this last is that it assumes that Parlos did not have a weapon. We do not think it does, and there was evidence that Parlos dropped the chair in the trunk room, before the shooting in the bedroom. There was evidence upon which to base such an instruction. We have not given all the instructions on self-defense, but only answered those parts selected for attack by the defendant.

Instruction No. 18 does not assume that the defendant did the shooting. This instruction is on the question of intent, and the court, in at least two places, qualified his language by saying, "If you should find he committed the act."

The objection to Instruction No. 19, on malice, is that it states that malice may be express or implied, but does not define what is express, or what is implied malice. We set out in full Instructions Nos. 19 and 20.

10. CRIMINAL LAW: inexplicit but correct instructions.

"19. Malice, within the meaning of the law, includes not only hatred and ill will, but also any other unlawful or unjustifiable motive which inspires one person to injure another, and it may be inferred from the willful doing of an unlawful act, within just provocation or excuse, with intent to injure the person of another. It does not necessarily mean hatred or ill will, but may be simply a vicious and wanton disregard of another's rights. Malice may be express or implied.

"20. Express malice may be shown by the exercise of such conduct in a transaction complained of as to indicate a wicked mind or malignant heart. Malice may be implied

from the unlawful use of a deadly weapon in a manner calculated to take the life of another human being. A deadly weapon may be any instrument capable of producing death from the manner in which it is used in a given case."

No instructions on this subject were asked by the defendant, and it seems to us there can be no just cause of complaint in regard to this matter.

In Instruction No. 23, the court told the jury that, if they should find from the evidence, beyond all reasonable doubt, that defendant was not acting in self-defense, and, using a revolver, assaulted deceased and shot him, and the deceased died as a result of the shooting, and there was malice aforethought, either express or implied, and so on, then, if the jury should so find, defendant would be guilty of murder in the second degree. We have not given it exactly as worded, because the only complaint is that it did not state upon whom the burden of proof rested; but the court had thoroughly stated that in previous instructions. This same complaint is made of other instructions.

It is said that Instruction No. 29, standing alone, assumes that the defendant is guilty of some crime charged in the indictment. This instruction has reference to motive. The instruction says no more than that, if the evidence fails to show any motive, or if it does, these are circumstances to be considered in making up the verdict.

The opinion is too long. We have considered some matters that perhaps do not really deserve attention. There may be some other matters which have not been noticed. All have been considered. After considering the whole case, we are of opinion that no prejudicial error appears. The judgment is, therefore,—*Affirmed.*

WEAVER, C. J., EVANS and SALINGER, JJ., concur.