STATE OF IOWA, Appellee, v. BROWNIE BROWMAN, Appellant.

**HOMICIDE:** Evidence—Sufficiency. Evidence held sufficient to sustain a verdict of guilty of murder in first degree.

**EVIDENCE:** Demonstrative Evidence—Connection With Controversy. Record under an indictment for murder reviewed, and held sufficient to justify the admission in evidence of a revolver, even though the same was not found on the person of the defendant, or in his house, nor was it positively seen in his possession.

**SEARCHES AND SEIZURES:** Unreasonable Searches—Waiver. The objection that articles sought to be introduced in evidence were obtained by an unreasonable and unlawful search of defendant's premises may not be urged, when, after successfully excluding the articles on said ground, the defendant, in his own testimony, voluntarily enters into an explanation of his possession of said articles.

**CRIMINAL LAW:** Evidence—Other Offenses Showing Motive. On the trial of an indictment for homicide, it is not error to receive in evidence, *strictly on the question of motive*, articles which represent the fruits of a recently committed offense with which the accused is shown to have had connection.

**CRIMINAL LAW:** New Trial—Denial of Fair Trial. The fact that, during the trial of an indictment for homicide, a stranger to the trial, armed with a revolver, was found in the court room and was quietly disarmed, affords no grounds for new trial.

**JURY:** Waiver of Right in Criminal Case. A defendant on trial for a felony may validly agree to a trial by a jury of eleven.

**CRIMINAL LAW:** New Trial—Misconduct in Argument. Argument for the State in a homicide case reviewed, and held not to present reversible error, especially in view of the finding of the court.

*Appeal from Polk District Court.*—JOSEPH E. MEYER, Judge.

MAY 10, 1921.

APPEAL by defendant from a conviction of the crime of murder in the first degree and sentence of life imprisonment.— *Affirmed.*

*C. C. Putnam,* for appellant.

*Ben J. Gibson,* Attorney General, *John Fletcher,* Assistant Attorney General, *Arthur Rippey,* County Attorney, and *H. W. Byers,* for appellee.

PRESTON, J.—A summary of the errors relied upon is: The alleged insufficiency of the evidence; error of the court in ruling upon the admission of certain evidence and exhibits offered by the State; error in the instructions; a transaction that occurred in the court room during the trial; proceeding with the trial of the case to 11 jurors, with defendant's consent, after a juror had been excused because of illness; misconduct of counsel for the State in argument to the jury.

1. HOMICIDE: evidence: sufficiency.

The murdered man, C. J. McCarthy, was a police officer of the city, and had been for a number of years, and was killed while engaged in the performance of his duties. The murder was an atrocious one, without the slightest provocation or excuse. The evidence is partly circumstantial, although there were eyewitnesses to the killing. Two or three of them identified the defendant as the man. There were electric lights in the vicinity : two lights on the outside of the building just above the colored man, as he sat on a ledge by the side of the steps of the stoop, just before the shooting. The evidence of a large number of witnesses for the State is denied only by the evidence of defendant himself, as a witness, except that the clerk of the grand jury gave testimony tending to impeach, by contradictory statements, one of the State's witnesses. Notwithstanding the impeachment, the weight of such testimony was for the jury. *State v. Carpenter,* 124 Iowa 5. Because of the importance of the case, and since the sufficiency of the evidence is challenged, we deem it proper to go into the evidence somewhat in detail; but a brief statement of the general situation may be helpful at the start.

The murder was committed about 3 o'clock in the morning of September 27, 1919, at or near the northeast corner of the Flynn Dairy building. The defendant is a negro. He lived a few blocks from the Flynn Dairy. The person who did the

killing was a negro, who, at the time of the killing, was under arrest by McCarthy, upon complaint of the Flynn Dairy people, upon suspicion that he was the party who had been stealing milk from the wagons for some time previous; and it was thought, also, that the person so under arrest had been prowling around the neighborhood of the dairy, where a number of burglaries had been committed during the summer, and that he had committed them. The theory of the State is, as we understand it, that the motive for the shooting was to escape prosecution for burglary or larceny, and counsel for defendant concedes that this is probably true. Deceased was shot twice, once through the heart. Another shot was fired at the patrol wagon as it approached, just before the shooting, and another afterwards. One of the drivers of a milk wagon, Miller, testifies that, a number of times prior to the transaction in question, he had seen a negro whom he afterwards identified as defendant, at different points along his route, and that he suspected the negro as the person who had been taking milk from his wagon during his absence in making deliveries. On one occasion in the daytime, he saw defendant, as he says, upon the street two or three blocks from the dairy, and asked him if he lived in that community, to which the colored man replied, "No," that he lived on Ridge Street. A night or two previous to the killing, McCarthy had accompanied Miller, for the purpose of discovering the person who was guilty of larceny of milk from the wagon, and to locate the party who had committed burglary in the vicinity. On the night in question, the officer went to the dairy on the same mission, but at this time did not start out with the driver. He remained at the dairy a few minutes, putting on some overalls, probably to cover his uniform. Later, he started out over the route covered by Miller. When Miller had driven about a quarter of a block from the dairy, he saw a colored man, who, he says, was the defendant, and ran to McCarthy and said: "There he is; go to him." Deceased went across the street to where the colored man was, and halted him, and Miller came across and told McCarthy that he was in possession of the right man. McCarthy then took defendant to the dairy, and had one of the employees, Watkins, call the patrol wagon.

1. Witness Miller, after describing the dairy, brick build-

ing, driveways, steps, and so on, says that, during the months of August and September, he learned of a number of burglaries committed in the vicinity, and says that milk had been stolen from his wagon, prior to the murder; that he had seen a colored man a number of times, a few times close to him; that the man he stopped and talked with, and the man he met, was the defendant, and the same man who was arrested and who shot McCarthy; that the colored man wore an overall jacket, dark blue (looked like a new jacket, a newly washed dark blue jacket), a pair of light shoes, which he at first took to be elk, but afterwards discovered that they were tennis shoes, and a dark cap; that he watched for the colored man, and studied his bearing and walk, so that he would know him if he saw him again; that, on the night or morning in question, when he had gone about a quarter of a block, he saw the defendant, saw the white shoes, and told McCarthy to go to him; that just then he went by one of the gas lights; that witness had a miner's lamp on his cap, a brass lamp, which burns carbide; that it has a reflector on it, and makes a very bright light; that, when he went across to McCarthy, he walked two feet in front of defendant, with the light shining on his face; that he sized him up; that he looked him over from head to foot; that he noticed a peculiarity in his walk; that he does not know just how to describe it, but studied it night after night, when he would see him; that he saw defendant at the office of the chief of detectives afterwards, and saw him walk there; that defendant walked the same as he did on the street; that he walked several different ways; that he walked the same and his build was the same as the man he saw up there. He describes the cap, jacket, and tennis shoes, and says he told McCarthy he was sure the man was the right one; that McCarthy and the man under arrest went towards the building, and Miller went on delivering milk; that, after he had gone on down the street, he heard some shots, 10 or 15 minutes afterwards; that he is positive that defendant is the man that McCarthy arrested in his presence; that, at 3 o'clock in the morning, it was quite dark; that it didn't get light until 5 o'clock. Witness was examined at length as to his identification at the time and afterwards, and as to other colored men.

Watkins testifies as to his employment at the dairy; that

he saw McCarthy come to the plant, the morning in question, and that he had a colored fellow with him; that the negro was dressed in an overall suit, cap, and canvas shoes; that the negro said his name was Jackson; that he and McCarthy walked past witness out of the driveway onto the street and down to the corner; that he called the patrol wagon; that he accompanied McCarthy and the colored man to the corner; that he stopped at the northeast corner of the building. He describes the steps and the ledge at the side of the steps, and says that McCarthy and witness stopped at the corner of the building; that the negro sat down on the north ledge that runs out along the edge of the steps; that he was facing east, and McCarthy was north of him, 5 or 6 feet; that witness was straight north of him, a foot from McCarthy; that the colored man sat down on the ledge, his left foot resting on the sidewalk nearest to them, his right leg over the ledge; that he saw the lights of the automobile, the patrol, coming; that, when the patrol got almost to a stop, the colored man "whirled on his foot, facing us, and I dropped to the sidewalk and hollered to McCarthy to get back. As near as I can recollect, I seen the flash of the gun and heard the report at the same time, and I got up and ran. I ran west. When I got to the entrance, I seen somebody reeling back and forth across the sidewalk. I went to the city jail, after this, to examine negroes for the purpose of identification, several times; saw this colored man, sitting here, at the police station. To the best of my judgment, I would say it was the same man that was out there the morning McCarthy was killed. Saw no other negroes around there, except this man that McCarthy brought. The two lights, both lit, are right above each ledge. There were two lights, each about 32-candle power, shining brightly there, and the colored fellow was under them. I was right close to him. When I dropped to the pavement, I thought the colored fellow fired only one shot; that was my best judgment at that time. Afterwards, they told me he had two bullet wounds in him. To the best of my judgment, I only heard the one shot. I don't know as I ever was positive that defendant was the man. When I went to the station to identify the man they had, defendant come in and sat down. He then had on a hat and a white collar. They never tried to put a jacket on him or a cap.

The man up there under the lights had on a leather cap, or part leather and part cloth, canvas shoes, and a dark blue overall suit. Would say the jacket had not seen a whole lot of service. The shoes were the kind that come up around the ankle.''

Latham drove the patrol wagon that morning. As they approached the dairy, he saw a colored man sitting on the approach of that step, and McCarthy and another man standing alongside of him. The negro had on what he supposed was a pair of overalls and jumper jacket and cap. He was a man 5 feet 8 or 9 inches tall, rather heavy set, had broad shoulders, high cheek bones, and was rather dark. He saw him sitting there before the shooting. Two bright lights were burning at the doorway.

Suess says he accompanied Latham to the dairy. He testifies that:

''The negro was about 5 feet and 9 or 10 inches, and weighed about 180 pounds, I should judge. Saw defendant at the police headquarters. According to his height and weight, and to the best of my knowledge, I took him as the man. Was about 200 feet south of where McCarthy was shot. The negro that ran past me was wearing light shoes, cap, and had a jacket that I think was an overall jacket. He made no noise whatever, as he went along the street. As he ran past me, I noticed that his cap looked like a shop cap. It was dark. The patrol wagon had a bullet hole in it on the side towards the Flynn dairy. In my judgment, it was a 32-caliber bullet hole.''

Chiesa, milk driver, saw McCarthy, the morning he was killed. He and a colored man came into the plant. The colored man asked witness if he knew him. He was dressed in some kind of blue pants and jacket, either blue or black. The negro sat down on the steps.

''Went to the police station afterwards, and looked over two men for identification. Can't tell whether defendant is the man; it is hard to tell for me. I never saw him for long. The colored man at the dairy was large.''

Higgins, a dairy employee, saw McCarthy, the morning he was killed; was in the driveway on the dock where they load wagons, when he and the colored man came in. The colored man asked witness if he knew him, and was told he did not.

"He had on a blue denim jacket. Good-sized fellow, tall and medium color; not the blackest nor the whitest. They had me down to the police station a couple of times, to look over some men to see whether I could identify them,—whether it was the same negro McCarthy brought in. Could not swear that it was the same one. Heard the shooting, came down then, and went out on the sidewalk. At the station, saw a man probably the build and general appearance as the man at the dairy with McCarthy; the same general appearance."

Lee says he was in Mercy Hospital on the first floor, September 27th; that shots attracted his attention about three o'clock; that the nurse had been up, to give him medicine; that the sound of the shots came from the northwest; that, after the shots, he saw a party coming across the hospital grounds, running, who passed within 200 or 250 feet of his window, running rapidly to the southeast.

"Am not telling the jury that I am attempting to identify the defendant as the man. As he ran past the hospital, I observed a cap and loose jacket of some kind."

Witness says the man was not white; that he could see plainly the face with the cap on,—not enough to tell the features; that his face was not white. "The last I saw of him, he disappeared over the hospital grounds."

Sarah Breunia, nurse for Lee, remembers giving him some medicine about 3 o'clock, and 5 minutes afterwards, heard some shots that came from the northwest; also, the noise of an automobile, after the shots were fired. The dairy is two blocks west and a block north of the hospital.

Cronkhite, sheriff of Marion County, saw defendant in jail at Knoxville; had a conversation with him in reference to the murder of McCarthy; talked to him about his guilt or innocence; told him he knew whether he was guilty or not; asked him if he wanted to make any confession, and said that, if he did, he would bring an attorney. Defendant said that, if he had anything to say, he would tell it to the judge; he said he knew he was up against a bad jamb.

Defendant testifies that he was mistreated by the sheriff; but other witnesses in rebuttal who were present deny that.

Delmedge, city detective, searched defendant's house at

1032 West First Street, October 5th, with Pettit. He was asked to tell what he found in the house when he searched it; and, upon objection by defendant and examination by him, it appeared that defendant was at the police station at the time of the search, and that witness entered the building by unlocking a padlock and going in the front door; that there was no one there who admitted him; that he had no search warrant. After some discussion between the court and counsel, the question was withdrawn. Later during the trial, this witness was recalled, and testified that, after he and Pettit brought defendant to the station, they went up to his house, Sunday morning; that he was in the jail when defendant asked witness to bring defendant a package of smoking tobacco; that he said it was in his coat, hanging up on the wall in his house; that witness told him he would get it for him up there, and did so; that he brought it back and gave it to him at the jail, Monday morning.

"When I went up there, I found the house locked; had a key that opened the lock, and opened it and went in. Q. Did you find the coat where he told you it would be?"

The question was objected to, and there was some discussion between the court and counsel, counsel for the State saying that, when the question was up before, the record did not show that defendant had requested witness to go to his house and bring him anything, and stating further that the State did not wish to press anything that was even close. The question was not answered.

Pettit, city detective, was assigned to the work in connection with this murder; went through a number of houses on Second and Ridge, and down the dumps in an effort to locate the party.

"Saturday following the murder, I was told about the Seeburger boy finding a pistol in an old shack of a house near defendant's home; stopped and got the pistol; looked through the old house, and, as I came out, saw defendant going by; stopped him and asked him his name, and he said it was Brownie. He had some old clothes under his arm, which later proved to be a pair of trousers and a long shirt. Asked him where he lived, and he said, 'Right there,' which was the second building from the old shack. There is one small shack between where

Browman lived and where the boy found the gun. Mrs. Abel lived there. Searched him; didn't find any revolver. Identifies the revolver Exhibit B as the one he got from the Seeburger boy. It is a 32 automatic. It looked as though it had been used recently. Took him to the chief; searched him; found $2.61 in his pocket, and $124 in his stocking. After that, was in the place where Browman said he lived that Sunday morning. Delmedge was with me. The house was locked. Delmedge had a key that unlocked the padlock. He opened the door. The bullets the boy gave me fit Exhibit B. I think the chief put the bullets in the drawer and got them mixed up.

"Q. On the same day when you say you went to Mr. Browman's house after he had been arrested, when you went with Mr. Delmedge, did you see any property there of any kind? I do not want you to state the kind; I want you to state the fact. A. Yes, sir."

Defendant then objected to the question, for the same reasons as to the evidence of Delmedge, and moved to strike the answer. After some discussion, the objection and motion were overruled.

"Q. The article or articles you secured,—what did you do with them? (Same record.) A. I turned them over to Chief McDonald. I haven't got them now; I haven't got them in my possession."

The house where Browman lived is seven blocks east and one block south of the Flynn Dairy. The defendant's house was in a district where there are shacks and small houses. A good many negroes live there. There is an incline at Browman's house and Abel's, higher than the street. The house in which the boy found the gun is an uninhabited sort of a shack, that is run down, and not occupied. It is south of Mrs. Abel's.

Galvin testifies that, in the early morning of September 23d, he was rooming at a place west and south of the Flynn Dairy; was awakened by Kinney, saying that there was a man at the window, and at the same time there was a noise of something falling off the dresser. Looked out of the window, and saw the form of a man between the house where he was and the next one west.

"He jumped over a low iron fence into the yard next door, and then seemed to jump back into our yard. There was a bright light in front of the house, and I could see his shadow move toward the light. Could hardly say that I had such a clear view as to tell whether the man was white or colored." Over objection, says that he afterwards discovered the loss of some articles belonging to him. Immediately went to the front door, after leaving the window, and could see no one in the front yard. Returned to the bedroom, and discovered his trousers and shirt gone from the head of the bed where he had left them. "Had a watch and a key chain with some keys, knife and some silver in the trousers, and in another pocket a leather bill fold, with about $94 in it. The shirt had a pair of gold cuff links in it, bearing the initial G. The police were called immediately, but no discovery made that night. The next morning, my watch was found in the front yard. The trousers and shirt were rolled in a bundle, and lying in the back yard. Everything was gone out of the trousers, and the cuff links were gone out of the shirt. Next day, found the key chain and keys between Seventh and Eighth, and a number of receipts and papers that had been in my pocketbook, in the alley between Seventh and Eighth, north of Laurel. They were scattered for a distance of two blocks. Exhibit C, being a square piece of gold plate, with the letter G on it, is a part of one of my cuff links that was in my shirt, to the best of my knowledge and belief. In the money which was in my book was one $20 bill, on which I had observed the figures '76' across the face of it, in blue pencil. To the best of my belief, that [the bill shown] is the $20 bill I had among my money. This is the same figure, in blue pencil. Reported the marked $20 bill to the chief of detectives or one of his assistants, the next day, and told him that, on a $20 bill that I had, were the figures '76' in blue pencil. To the best of my recollection, there was one $20 bill, two $2.00 bills, and the balance in 5's and 10's,—can't state the exact number. Talked twice with the chief about the marked bill. He again asked me to describe the bill or the markings on it. He then showed me a $20 bill. This bill that you have showed me and the marking on it are identical, to the best of my knowledge."

Kinney testifies as to the Galvin transaction. It was three

o'clock in the morning. He awakened in time to see face at the window. He was 3 or 4 feet away. It was a colored man. When they got to the front door, he was out of sight. He then gives testimony similar to Galvin's as to the trousers, shirt, watch, and money's being gone, and that the cuff links were gone from the shirt; and testifies to the finding of the articles in the yard.

Mrs. Galvin gave similar testimony as to the burglary and the articles taken and the finding of some of them in the yard; says she gave the cuff buttons to Mr. Galvin as a gift; purchased them at Plumb's Jewelry store; had them engraved with the initial G. "Exhibit C is half of one of the cuff buttons I gave him, as far as I could identify it."

Russel, jeweler, says that the cuff link, Exhibit C, is one of Plumb's buttons, because it has the stock number on the back, and the engraving is his; did it himself. It has been cut by a left-handed engraver. Was working upstairs and did not see the customer. Knows that he put that initial on himself, prior to September.

McDonald, chief of detectives, says that all the men under him were detailed on this case, and a diligent search made during the week subsequent to the killing; that 25 or 30 suspects were brought in; that the first man that was absolutely recognized was defendant; that, one time after he was brought back from Fort Madison, Watkins requested to have another view of him.

"Defendant was brought in Sunday morning by Pettit, who searched him in my presence. Defendant offered no resistance. A book and some money were taken from him, $126 in bills and some cents. Pettit got the money down in his shoe or in his leg, some place in his stocking, I guess. Defendant said he won it gambling. Did not examine the bills that morning, so I could tell about any particular bill, but I did while the money was in my possession, and before anyone else had gotten it. Noticed this $20 bill marked '76' on it in blue pencil. Defendant got 20 cents of the money to buy tobacco with, and gave this receipt for the tobacco. The morning defendant was brought in, we told him we were going up to search his house. He didn't object. I believe he made the request from Delmedge,

at that time, to go in his pockets and bring him some tobacco. Delmedge went to the man's house that morning, under instructions from my department.

"Q. Was anything turned over to you by either of these men? A. Yes, sir. Q. You may examine—

"Mr. Putnam: Just a moment. Do you now propose to offer, for the examination of this witness, something that was claimed to have been in the house of this defendant?

"Mr. Byers: I am at this time seeking to have this witness identify articles that were turned over to him by these men on the day of the arrest, and ask him with respect to them.

"Mr. Putnam: Are you now claiming these articles were found in this defendant's house?

"Byers: I don't know about that; it is my understanding they were, but I am not yet offering the articles. I am trying to make them competent, is all, to offer them when I get to them.

"Q. You may examine Exhibit B, and state if you ever saw that before [the revolver found in the old shack]."

Thereupon, there was some discussion between counsel and the court, counsel for defendant desiring to ask some questions for an objection; and counsel for the State stated that they simply wanted to identify these things now, and they would offer them later, and counsel for defendant could make all the examination he wished. The question was repeated, and witness answered:

"A. I did; I saw it in my office. I believe Pettit and Delmedge delivered it to me. I put it in the envelope, marked it as evidence, and turned it over to the grand jury."

Other articles were identified as having been delivered to witness by Delmedge and Pettit and then turned over to the grand jury. Witness continues, and says that he asked defendant if he ever owned a pair of canvas shoes, and he said he had not.

"That was before he saw the shoes. Then showed him the shoes, and told him they were found in his house, and he stated they belonged to a tall, slim, yellow man, by the name of Smith. He did say that he had worn the same kind of a shoe last spring, for a while; that these shoes were too large for him. This conversation about the shoes was the day he was taken to Knox-

ville. He was taken there for safe-keeping. The chief of police got alarmed that there might be some violence towards him, and it had not been given out that he was in custody yet. He was taken to Fort Madison. The pistol, Exhibit B, was turned over to me as a part of the search, and as an incident to the arrest of defendant. It was fully loaded. Would not say definitely that you had the wrong set of cartridges here a moment ago; I might have got them mixed up with others.''

On cross-examination, witness was interrogated at some length as to different persons who were suspected, his conversation with some of the witnesses as to how he understood the party was dressed, telephoning to the dairy to have the witnesses come down and examine prisoners, and so on. He was also asked by counsel for defendant in regard to witness's having told Miller that he had a pair of tennis shoes that were found in Browman's house, and about the money found on defendant's person, and the pistol, and that defendant had been arrested in the neighborhood where the gun was found, and so on.

Fred Seeburger, 12 years old, says he knows Mrs. Abel, and where her house is; that there is an old shack right south of her house.

''About a week after the McCarthy murder, I went down to this house. The boys were in the habit of playing around the house. I was playing around there, and I just happened to find a box, and it had a gun in it and some bullets; a revolver. It was a cigar box. I was going down to my boat, and I was going past this house, and I thought I might need a board or so to fix the boat, and I went in there and started to breaking down the wall, and it just happened that, when I slipped my oar in I was carrying with me, this box fell on the floor part of the way, and I pulled the box out and I unwrapped it, and it was a gun; and in a little Red Belt tobacco can there was these bullets; and then this lady from the next door, she came over, and I had the box behind the door, and she told us to go away, and I started to walk up the road, and she went back in the house, and I came over again, and I got the gun and unwrapped it. It was in some cloth, and I wrapped it, and I took it and started down the road, and this negro came out and just

as I was going out of the house, and I started down the road, and he came out of the house there and he asked me where I was going. He came out of the second house from this old shack. Came out of the second house north of the shack where I found the gun. That would be the first house north of Mrs. Abel's house, he came out of. There is a high bank there, and he walked in front of these houses here, and stopped in front of Mrs. Abel's house. He said to me, 'Where are you going?' And I said to him, 'Going down to fix my boat;' and that is all he asked me. And then he started to walking over towards this house, and I started to run, and got up in the alley, and I couldn't see him any more. I ran, and took the gun home with me. When I found the gun there, it was about 2 o'clock on Saturday. When he spoke to me and asked me what I had there, I had the cigar box in my hands, and the gun was inside of it. I think this gun, marked Exhibit B, is the gun that I found at the abandoned house. Those shells fit in the chamber of the gun. I turned the shells over to the detectives, with the gun. It was Saturday or Sunday morning. When he asked me where I was going, I told him, 'Going down to fix my boat;' and had some tar in my box. Was kind of afraid, if Mrs. Abel would see it, she would take it away from me. She kind of watches the house, when the boys break it to pieces. Wasn't running from defendant. Never saw defendant go in the old house.''

Harry Crump, colored, 17 years old, knows defendant; talked with him a few times.

''Have seen him dressed in an overall jacket, dark cap, and dark trousers. Never noticed his shoes. He had some light shoes of some kind on. Know Margaret Graves, Annabelle Brandt, and Edna Scott. Defendant said the girls told an officer about him having a gun, and he was searched and didn't find the gun. He said the girls told the officer he had it under his arm; that the officers searched him, and it was not under his arm. Made some remark that it was some place on his leg.''

Marjorie Graves, colored, 18 years old, knows defendant and Crump; has known defendant six months.

''Sometimes Sundays saw him with a checkered suit and light hat. Sometimes during the week, nearly always saw him with a dark cap, overall jacket, sometimes with dark shoes, and

sometimes with tennis shoes. Heard about McCarthy being killed. About two months before that, saw defendant in possession of a gun. Two girl friends were with me. We were walking up the street. He was behind the billboard, and came out from behind it. He said 'Annabelle,' first, and then he said 'Marjorie,' and I stopped, and the other girls started to running, and Edna was close to me, and he said, 'When are you coming up to my house?' I said, 'I don't know.' He said, 'You see this; you are going to tell me, or else—' I said, 'I will either be up Saturday or Tuesday,' and he said 'All right;' and I tore out. He produced a revolver. It was a 32. He pulled it out from down his leg; reached over and pulled it out. Seemed to be halfway between the ankle and the knee. After I told him when I would come, he put it back. Got a policeman and told him about Browman, and the policeman stopped him and searched him, and couldn't find anything on him. That was right after Browman had put the gun back on his leg. This gun you hand me, Exhibit B, resembles the gun I saw Browman pull out there. I did not have the policeman search defendant,—the Scott girl did. Annabelle brought the policeman back, and the Scott girl told him he had a gun. The policeman told me he couldn't find the gun. These shoes, Exhibit A, resemble the shoes I saw Browman wear.''

On cross-examination, she gave testimony tending to affect her credibility: that she had been married, and her husband secured a divorce from her, and so on. The clerk of the grand jury gave testimony as to what she said before the grand jury in regard to the position of the other girls at the time of the transaction, and so on.

Mrs. Abel testified that defendant occupied the house immediately north of hers for four or five months, and that he lived there alone; that the house just south of hers is only part of a house, torn down so that it is not fit to live in.

''My house is No. 1030 West First Street, and defendant's 1032. Mostly he dressed in a light checkered suit. Saw him out several times with a different suit on, but could not tell what it was,—I paid so little attention I don't remember. Have seen him wear a dark-colored cap. Don't call to mind seeing him wear an overall jacket. Have seen him wear different kinds of

shoes, dark shoes sometimes, and white shoes at another time. Really don't know enough to know whether they were white. Read of McCarthy being shot. Heard of the boy finding the revolver in the abandoned house near to mine; only know what I heard. Remember having some conversation with some young boy or boys at the abandoned house after McCarthy was killed, and I told them to go away. Q. Do you recall of Browman coming over there while you were having the conversation with some boys? A. I remember, one afternoon, feeling bad and lying down, and the boys made such a racket at the old house, and I got up and went to the door and told them they must go away. They went away. Never saw Browman go into the old shack.''

Lottie Washington, colored:

''Know where defendant lived; have seen him going in and coming out of his house. Paid no attention to his shoes all the time; have seen him in black shoes, and with light shoes on; don't know that they looked like tennis shoes; they was light; they might have been; they were something like the shoes you hold in front of me; wouldn't say he wore them after August; don't know; never saw him with a black leather cap.''

Martha Barrett:

''Have seen defendant going in and coming out of his house two or three times. Don't really know what he did have on both times. Saw him with a blue jacket on, a sort of an over-all jacket, and some kind of white slippers or white shoes. Would not say I ever saw him with white shoes on after August; it was warm weather, though.''

McCann:

''Last fall and summer, defendant had a blue pair of pants and blue overall jacket. Don't know what kind of shoes; never paid any attention to his shoes. Seems to me I have seen him with a leather cap on,—kind of a black cap.''

Sarah Childress. After McCarthy was killed, and when near the old shack and defendant's house, defendant passed her, and stepped back to Mrs. Abel, and said to her, ''If there is anyone in the old house, I will run them out.'' ''I understood him to say a man. When I saw him just before that conversation, he went between this house towards his own home.

I know he said, 'I would chase them out.' Mrs. Abel told me he said boys, and I understood it a man. Didn't see any boys or men around there at that time.''

Mabel Cunningham gave testimony similar to the others as to how defendant was dressed at times. She saw him before the killing, as did witness Noble.

Newman examined the police patrol wagon, the morning after the murder. Found a bullet hole through the left side and lodged in the right side of the wagon; went clear through. Exhibit F is the bullet.

It should have been said that some of the witnesses are more positive in their identification than others. This is natural; but the fact that some witnesses are more cautious than others may have a tendency to strengthen their testimony. *State v. Christ,* 189 Iowa 474.

The revolver was offered and admitted in evidence over defendant's objection that it was incompetent, irrelevant, and immaterial, and because there was no competent evidence of this defendant's connection with the possession of the exhibit, and no identification—it furnishes no means of identification of the defendant. The package of bills, amounting to $124, among which was the $20 bill, with the figures "76" in blue in pencil, and two $2.00 bills, was offered and admitted in evidence, over defendant's objection that it is incompetent, for the reason that it is an attempt to prove defendant guilty of another crime, and furnishes no basis for holding defendant responsible for any of the acts alleged to have been committed at the time it is claimed the money was taken from the Galvin home; too remote, and so on. The State stated that the offer was made for the purpose of showing a motive, and for no other purpose; and the court, in overruling the objection, stated that it would be received for that purpose, and that the jury would, later on, be instructed to consider it for no other purpose. The shoes and cuff button were not offered in evidence in chief, and there was little, if any, evidence introduced with reference to finding the articles in defendant's house, but, at the close of the evidence, the court stated:

''Before we proceed further, it might be well for the court to withdraw from the jury that part of the testimony relative

to the articles found in the defendant's home. (Counsel for the State stated that they had no objection to its being done then, or later, with proper reservations to the other testimony as to the shoes, as to the way they looked, and so on.)

"Mr. Putnam: The court having so withdrawn the evidence from the jury, under the objection of the defendant, I might state at this time that I expect to introduce in evidence the defendant, upon the witness stand, and he will testify in regard to these—to the articles, the shoes which were found in the home, and the cuff button which was claimed to have been found in the home.

"Court: With that statement, we will leave the record as it is at this time."

The defendant testified at great length, and, after stating his different occupations and residences, and describing his and the surrounding premises, testified that Mrs. Abel complained to him, two or three times, about the boys' making a noise at the old shack, and, in explanation of Mrs. Childress' testimony, says, in substance, that he told Mrs. Abel he would tell the boys to go away and not disturb her; that sometimes others stayed with him at his home; that sometimes they would change clothes there; that sometimes he was at home alone; had two beds. He testified as to the Seeburger boy transaction about as the boy did; that, a year and a half before, he bought an overall jacket; that he quit wearing it about the middle of August, and then sent it to the laundry times and times, and it was worn out; that it is nothing more than a shirt; that it was blue; that, last summer, he tore it up and threw it away.

"Haven't had one since. Bought a pair of canvas shoes in May, and they were worn out about two months afterwards. Didn't have them on in the month this officer was killed. Another fellow who stayed with me a while bought a pair in the same month. When he left, he left his things there. The reason he went away, he owed me money. Him and I was gambling, and he lost all the money he had, and I put him out, and the things he left there are there yet. There was a pair of tennis shoes in my home; they were John Smith's. He was living there, rooming with me. Don't know where he is now. The tennis slippers, Exhibit A, look like the slippers he left

there, 11 E. I wear 10. The tennis shoes I bought myself were like these. (Witness put the shoes on, and said that they were a little too long.) Never wore a leather cap; had a striped cap and a brown cap. Saw the Seeburger boy have the cigar box; didn't know what was in it. When Pettit took me to the station, I had my dirty clothes wrapped up to take to the laundry. Got some other clothes. Used dark gray pants over the better ones, so that I could keep my clothes clean when we would be shooting craps on the ground. Most every other day would go out and meet a gang of fellows and would gamble in the alley.''.

Saturday evening there was no game, and he pulled off his old pants and put them in a barn, because he was figuring on coming back in the evening. Got them Sunday. Testifies in regard to meeting and conversations with some of the other witnesses, and his arrest and the search. Claims the officers swore at him, and called him a thief and a convict, which defendant denied. Tells about witnesses coming to the jail for identification; that the officers were unfair to him; that the chief refused to let him see a lawyer, and a lawyer was not furnished at Fort Madison. Says he did not confess to Cronkhite; says they never mentioned the cuff button, while he was in jail, that was claimed to have been found in a cigar box in his house.

''Had a small cigar box in the kitchen; had one with fishing tackle in it. The first time I saw this piece of cuff button I have here was when you showed it to me here. When I would go out with a lot of fellows, I would not take more than $5.00 or $10; left the rest around the house in the stove or bed, or under the carpet, so I wouldn't lose it all. Did little odd jobs at that time, and all last summer. I had $126, when arrested. Watched them counting the money taken from me. Didn't see or have any $20 bill in that roll at that time. McDonald never called my attention to any marked bill.''

He testifies to meeting the girls, but says the Graves girl was not there, and the officer asked him if he was the one that was running the girls, and witness told him no; that he saw some girls running, but didn't speak with them; that there was no billboard there; that he never owned a gun or talked to any-

body about a gun in his life; that he hasn't seen the Graves girl since she was at his house last winter; that he never told Delmedge to get tobacco.

"Have never been up around the Flynn Dairy. I have stayed with Marjorie Graves and some of these girls. Before Marjorie was married, they used to be around where I was living; came down and stayed two or three nights. Never pulled a gun on McCarthy or anybody, or shot anybody in my life. The biggest part of this money I worked for and earned in Indiana. The money that was in there that I made by gambling, how can I tell? $15 or more maybe; sometimes $15 or $20 in the game; sometimes $4.00 or $5.00. I had this $124 in money in my pocket, when taken to the police station. When I was arrested, I told the chief and Pettit that I was at home the night McCarthy was killed. I went home that night about 7 or 8. No one stayed with me after the first week in September."

In rebuttal, Pettit testified that, when searched, defendant had $2.61 in a purse in his pocket, and $124 in currency in his stocking; that defendant said he got the money shooting craps; that there was no swearing at defendant in his presence.

Delmedge testified to going to defendant's home after his arrest, on the same day, and was asked what, if anything else, he got out of defendant's house. Defendant's objection was overruled, the State claiming that defendant had opened the door by his examination; and witness testified that he found a pair of tennis shoes and a piece of a cuff button, Exhibit C, which was found in a cigar box in the front room, with some fishing tackle and other articles. Exhibit C was then offered and admitted in evidence, over objection. We have set out the evidence more fully than intended. We are clearly of opinion that the evidence is abundantly sufficient to sustain the verdict.

2. One of the points most strongly urged by appellant for a reversal is the admission of the revolver in evidence. Several cases are cited on the proposition. True, the revolver was not found on the defendant at the time of the arrest, nor seen in his possession, nor in his house after the killing; but we think that, when all the circumstances are considered, the jury were

2. EVIDENCE: demonstrative evidence: connection with controversy.

justified in finding that he had such a revolver and used it; that he concealed it in the old shack to divert suspicion from himself; and that the revolver was the one used by him, and therefore properly admitted in evidence. The concealment of the revolver would be in line with the evidence of witnesses who say that defendant gave an assumed name, and Ridge Street as his residence. At the risk of repetition, some of the circumstances will be mentioned. McCarthy was killed by a 32 bullet. Exhibit B is a 32 pistol. The evidence of the Graves girl, though denied, tends to show that defendant had a 32 pistol before the murder, which, she testifies, resembled Exhibit B. Soon after the shooting, Exhibit B was found concealed in the old shack near defendant's home. The evidence of the Seeburger boy and of Mrs. Childress, though denied or explained by defendant, tends to show that defendant was watching, or at least was somewhat interested in the fact that others were visiting the shack where the revolver was concealed. The revolver offered in evidence appeared to have been recently used. The bullet that was shot into the patrol wagon, as it approached the place where McCarthy was shot, was a 32.

3. It is thought by appellant that the court erroneously admitted in evidence the cuff button and tennis shoes found in defendant's home, because they were secured without a search warrant; and that this violates the constitutional provisions against unreasonable search and seizure. These articles were not offered in evidence in chief. The State seemed chary about putting in the evidence in reference thereto, and, upon objection, stated that they would not press it. As before shown, whatever evidence there was, if any, which went in in chief, in regard to the finding of these articles in defendant's house, was, with the consent of the State, withdrawn from the jury. Counsel for the defendant so construed it; for he said, "The court having so withdrawn the testimony from the jury over the objection of defendant," etc., he proposed to interrogate defendant as a witness on that matter, which he did. If the defendant consented to the officers' going to his home, and requested them to bring him tobacco, it seems to us doubtful whether it could be claimed, under such circumstances, that there was an unreasonable

3. SEARCHES AND SEIZURES: unreasonable searches: waiver.

search. However this may be, and without determining that point, we think the defendant opened the door for such testimony in rebuttal. By objection to such evidence in chief, he secured the exclusion of such of it as went in, and then, when defendant's side of the case was reached, he went into it fully. In his testimony, he referred to these articles as having been found in his house. As to the cuff button, he denied that he had ever seen it before the trial, or that it was in his house. He at first claimed that he had never owned shoes such as these, according to the testimony of McDonald; and later claimed that the ones he did have were worn out in August; and then explained, still later, that those found in the house belonged to Smith. It is quite clear that, under such circumstances, the State ought not to be precluded from meeting in rebuttal the evidence of defendant so received. As to the marked bill found upon the defendant's person by search, the cases hold that this is proper. *Reifsnyder v. Lee,* 44 Iowa 101, 103; *State v. Hassan,* 149 Iowa 518; *State v. Lyon,* 176 Iowa 171, 175; *Getchell v. Page,* 103 Me. 387 (18 L. R. A. [N. S.] 253, and note); *Commercial Exch. Bank v. McLeod,* 65 Iowa 665. We do not understand appellant to contend otherwise, or to make the same claim as to the marked bill as they do against the articles found in the house. There was no error at this point.

4. Instruction No. 7 is complained of. By this instruction the court limited the effect of the evidence in regard to property taken from the Galvin home, a few days before the shoot-

4. CRIMINAL LAW: evidence: other offenses showing motive.

ing, to the question of motive. It seems to us that it might also be considered on the question of identity; but, under the record, that question is not in the case. The jury were further told by this instruction, in substance, that whether or not defendant was guilty of another offense should not be considered, in determining whether defendant was guilty of the crime charged, except as it might have a bearing on the question of motive; and that, if the jury should find that defendant had in his possession, prior to the death of McCarthy, the cuff button and the marked $20 bill, the question as to whether or not the defendant may have been guilty of wrongful or unlawful taking of such property from the Galvin home should not be considered, in determining

whether or not defendant is guilty of the crime charged, except on the question of motive; and that, if the jury failed to find that defendant so had possession thereof, the jury should disregard such evidence, and not consider it in determining the guilt or innocence of defendant in this case. The complaint is that the court failed to instruct the jury to consider whether defendant's possession was honest. Cases are cited by appellant in support of the proposition, where parties were on trial for larceny, and cases as to the effect of recent possession of stolen property, where there was testimony on behalf of the accused persons that they came into possession of the property honestly, or that they owned it. In the instant case, there is no such claim by the defendant. He says that he never owned or saw the cuff button until the trial, and denies that there was any marked bill among his money, and says further that he never committed any burglaries, and was not in the vicinity of the dairy or the Galvin home. Under the evidence, whoever the colored man was who took the property from the Galvin home, took it unlawfully. There is no pretense in the record otherwise. There is no pretense that defendant took it honestly. Defendant was not on trial for larceny. Some of the cases, too,—for instance, *State v. Emerson,* 48 Iowa 172,—were cases where the court put the burden of proof upon the defendant to reasonably satisfy the jury that his recent possession was innocent, and that the jury should convict unless the defendant did so show; whereas the Supreme Court held that, before the jury could convict, they must be satisfied beyond a reasonable doubt of the defendant's guilt.

Another complaint is that the instruction reads that, if the jury found that the defendant had such property in his possession prior to the death of McCarthy, it could be considered for the purpose stated. The claim is that there is no evidence that the property was in his possession prior to the death of McCarthy. True, there is no direct evidence to that effect; but the marked bill, according to the State's evidence, was on his person, and the cuff button, which counsel concede is damaging evidence (as it is), was found in his home, both after McCarthy was killed. The property was taken from the Galvin home shortly before the murder. If defendant, as the evidence tended

to show, was the colored man who took the property from the Galvin home, then the jury would be justified in finding that it was in his possession prior to the killing. If the colored man who was prowling around that neighborhood was the same person who took property from Galvin's, and the same one who was stealing milk, and arrested for the latter, it would tend to show that the party who had possession of the cuff button was the party who did the shooting, and thus would have a bearing upon the question of identity; but, as said, this point is not in the case. The defendant did not offer an instruction on this subject; but, at the close of the arguments, moved the court to admonish the jury then, and in its instructions, that they should not consider the evidence in regard to the transaction at the Galvin home, except upon the question of motive, and then only provided that they first found that defendant was connected therewith. We think that was the effect of the instruction given. There is no suggestion in this motion, if it is proper to consider it at all, as to the question whether defendant came into the property honestly. The general rule is that the State cannot prove against a defendant any crime not alleged in the indictment, either as. a foundation for separate punishment, or as aiding the proofs that he is guilty of the crime charged; but there are exceptions to this rule, and evidence as to other offenses is competent to establish motive, intent, absence of mistake, or accident, and a common scheme embracing the commission of two or more crimes so related to each other that proof of one tends to prove the other. It is also competent as bearing on the question of identity of the person charged with the commission of the crime on trial. These exceptions are illustrated and applied in the following, among other cases: *State v. Walters*, 45 Iowa 389; *State v. Jamison*, 74 Iowa 613; *State v. Desmond*, 109 Iowa 72; *State v. Brady*, 100 Iowa 191, 195; *State v. Saunders*, 68 Iowa 370; *State v. Lewis*, 96 Iowa 286.

The giving of Instruction No. 4 is assigned as error. It simply quotes the statute, in defining murder; but there is no argument on the point, and it has been held this is not error. *State v. Wilson*, 157 Iowa 698, 706.

5. During the afternoon of one of the days of the trial,

and at recess, counsel for defendant made a statement that defendant shows in the record that, during the period from the

5. CRIMINAL LAW: new trial: denial of fair trial.

starting of the session at 1 o'clock until the recess, the court room was filled with both colored and white people; and that, during said time, one of the deputy sheriffs brought a colored man from the midst of the court room, and in the presence of the jury, forward to the court bench, searched and handcuffed him, and took a revolver from him, and led him from the room. There was no proof at that time that the transaction occurred as stated,— merely the statement of counsel; nor was there any objection; and the State at that time denied that the transaction occurred as counsel for defendant stated. The statement was, perhaps, somewhat exaggerated. The matter was referred to and excepted to in the motion for new trial, and the court made a finding. If anyone in the audience, white or colored, was armed, it would be proper, and the duty of the officer, to disarm him quietly and in a proper way. The matter was done quietly. It was no part of the trial, and the prosecution had nothing to do with the transaction. The statement or finding of the court is that it was done in such a quiet manner that no one really realized what was going on or what had happened, until the colored man was in the presence of the court and jury, all of which was done without disturbance or excitement, and without comment of anyone in the court room; and that this fact had nothing to do in any way with the trial of the case, and in no way affected or prejudiced the jury. We are of opinion that this was a mere disconnected incident during the trial. The trial court was in a better position to judge of the matter than we can be, and the trial judge was of the opinion that there was no prejudice.

6. After the evidence was all in, and the arguments concluded, but before the jury was instructed, one of the jurors was taken sick, confined to his bed, and unable to go on as a

6. JURY: waiver of right in criminal case.

juror; and it was agreed in open court, between counsel for the State and the defendant, and in the presence of defendant, he personally joining therein and consenting thereto, that:

"Both the State and the defendant waive their right to

have the case submitted to 12 men, and agree that it shall be
submitted to the remaining 11, and that the verdict of the 11
shall be of the same validity, force, and effect in all respects,
as if returned by 12 jurors.''

Counsel for appellant say that no claim is made that
there was anything irregular in the agreement, but that he
deems it his duty, because of the importance of the case,
to present the matter as error, claiming that defendant had
not the right and power to waive a jury of 12 men. No
cases are cited by appellee on this proposition, and the mat-
ter is not referred to in its argument. A large number of
cases are cited by appellant from other jurisdictions, some of
which hold that, in a capital case, a defendant may not so
waive. In one of the cases so cited, *Oborn v. State,* 143 Wis.
249 (126 N. W. 737, 741), the court says that the doctrine of
waiver, as applied to a criminal case, is a very broad one, quite
as broad as in civil cases, and that it applies to constitutional,
as well as statutory, rights; and further, that an examination
of the cited cases shows that no limit has yet been found in this
court to the competency of an accused person in a criminal
case to waive irregularities or rights, except the single instance,
one of disability in a capital case to waive the right of trial
by 12 jurors. We shall not refer to other cases in other juris-
dictions, but only to the cases decided by this court. Counsel
concede that *State v. Kaufman,* 51 Iowa 578, and *State v. Gross-
heim,* 79 Iowa 75, sustain the trial court, though neither in-
volved a capital offense, and it is likewise conceded that *Busse
v. Barr,* 132 Iowa 463, and *State v. Smith,* 132 Iowa 645, bear in-
directly upon the proposition. The *Busse* case has reference to
a waiver of the number of grand jurors, and the *Smith* case to
instructions' being in writing. It is also claimed that the fol-
lowing cases support the error assigned. *State v. Rea,* 126 Iowa
65; *State v. Carman,* 63 Iowa 130; *State v. Larrigan,* 66 Iowa
426; *State v. Douglass,* 96 Iowa 308. The last four cases hold
merely that a defendant in a criminal case may not waive a
jury entirely. The Federal Constitution, Article 3, also cited
by appellant, provides that the trial of all crimes, except in
cases of impeachment, shall be by jury, and the Iowa Consti-
tution, Article 1, Section 9, provides that:

"The right of trial by jury shall remain inviolate; but the general assembly may authorize trial by a jury of less number than 12 men in inferior courts; but no person shall be deprived of life, liberty, or property, without due process of law."

Section 10 provides that:

"In all criminal prosecutions, and in cases involving the life or liberty of an individual, the accused shall have a right to a speedy and public trial by an impartial jury;     *     *     *"

A jury, at common law and under our statute, in a case of this kind, is composed of 12 men, and perhaps women, now. In the *Kaufman* case, supra, a felony was charged, and with the consent of the defendant, he was tried by 11 jurors, after one of the 12 had become ill; and it was held in that case that the defendant could waive the constitutional provision, and consent to such a jury of 11. The holding of that case has stood as the law of this state for more than 40 years. The judgment in the instant case was life imprisonment, the same as for rape. Though, before verdict, capital punishment was involved, the charge is, nevertheless, a felony. As said in the *Kaufman* case, the crime charged in some of the cases was a misdemeanor; but this fact possessed no significance, and the ruling is based on principles applicable to all criminal actions. The court further said that it was unable to see how it is possible to draw a distinction in this respect between misdemeanors and felonies, because the Constitution does not recognize any such distinction. Neither do the constitutional provisions make any distinction between capital cases and other felonies. All are upon the same level. Section 10 of our Constitution, supra, reads that, in cases involving the life or liberty of an individual, the accused has the right to a trial by an impartial jury, and so on. We are disposed to adhere to the holding in the *Kaufman* case, and that it is controlling in the instant case. Defendant had the option to take a continuance, demand a new jury, perhaps, or proceed with 11 jurors. He was under confinement, and doubtless desired a speedy trial, and elected to proceed with 11 jurors.

7. To our own minds, the most serious question in the case is the alleged misconduct of counsel for the State in the closing argument to the jury. We have some difficulty in under-

7. CRIMINAL LAW:
new trial: mis-
conduct in
argument.

standing why prosecutors and lawyers of standing will take chances by making statements upon which the claim of misconduct may be made, or at least by not seeing to it that a complete record is made of the argument for defendant, so that we may have the case, as nearly as may be, as the trial court had it. We are compelled to reverse some cases upon an imperfect record, and where we have only the closing argument. It is probable that some of them would not be reversed if we were in position to know the exact situation, as the trial court observed it. For this reason, we give some weight to the finding of the trial court that there was no prejudice. *State v. Cameron*, 177 Iowa 379, 381. We recognize the fact, as stated in some of the cases, that defending counsel often go outside the record, and make arguments for the purpose of securing an acquittal, because in that case there can be no new trial; but seek to hold counsel for the State to a more strict rule, and seek to make a like argument by the State a basis for a new trial by defendant, in case there is a conviction. The rule of law is the same in both cases, but, as indicated, the argument for defendant is less often complained of, and frequently not contained in the record. The State has the right to answer argument advanced or invited by counsel for defendant; and, where the argument for defendant is not preserved, it will be presumed, nothing appearing to the contrary, that argument by the prosecutor was a legitimate response to argument for the defendant. *State v. Cameron*, supra. See, also, *State v. Christ*, 189 Iowa 474. The presumption is aided somewhat in this case by the finding of the trial court that the arguments for both sides took a wide range, although the language used by counsel for defendant is not given. The defendant was ably defended below, and his case has been well presented here. We have no doubt that counsel for defendant, as well as for the State, used his ingenuity and generalship in presenting the case to the jury. There was, no doubt, more or less exaggeration by both sides; but, in *State v. Hasty*, 121 Iowa 507, 520, we said that hyperbolical expressions have been indulged in always, and probably always will be, and that it would be undertaking too much to vindicate all expressions of opinion made in the heat of argument, and that this is

not essential, to sustain a conviction. If not calculated to unduly arouse the passions or divert the jury from the proper discharge of their duty, the verdict should not be disturbed, even though the language used was disapproved. As said in *State v. Burns,* 119 Iowa 663, 671 (Weaver, J.) :

"No lawyer has the right to misrepresent or misstate the testimony. On the other hand, he is not required to forego all the embellishments of oratory. * * * It is his time-honored privilege to

'Drown the stage in tears,

Make mad the guilty, and appal the free.

"* * * but [these] are not often effective in securing unjust verdicts. The sorrowing 'gray-haired parents,' upon the one hand, and the broken-hearted 'victim of man's duplicity,' upon the other, have adorned the climax and peroration of legal oratory from a time whence 'the memory of man runneth not to the contrary' * * *."

And in *State v. Gulliver,* 163 Iowa 123, 137, 138, 139, the court, through Mr. Justice Weaver, says that:

"Jurors must be supposed to have some capacity to distinguish between the fury and fustian of partisan oratory and the rational analysis of testimony. * * * Within reasonable limitations, each side must be allowed to conduct its case in its own way. * * * This liberty is, of course, not to be enlarged into unbridled license of defamation and abuse."

In that case, counsel reflected unnecessarily upon the character of one of the witnesses, and indirectly upon the defendant; but it was thought inconceivable that the jury was influenced thereby. In *State v. Sale,* 119 Iowa 1, where there was a conviction of murder in the first degree, the court said:

"We are compelled to admit that portions of the argument, as quoted by counsel from the record, seem intemperate and unnecessarily violent in their character; but we have not, in the record, the argument of the counsel for defendant in addressing the jury, and have no means of knowing to what extent the argument of the prosecuting attorney was justified by the presentation of the defendant's case. Moreover, no exceptions were taken to the prosecuting attorney's argument at the time, and objection cannot be first made on motion for a new trial,

when, if it had been promptly made, the court might have restrained any undue zeal on the part of the prosecuting attorney, and thus have prevented the prejudice which is afterward claimed to have resulted. Under the circumstances, we cannot grant a new trial on this ground."

See, also, *State v. Thomas*, 135 Iowa 717, and *State v. Cooper*, 169 Iowa 571, to the point that the objection must be timely, and that the trial court has a discretion in refusing a new trial, unless it appears that the misconduct was so prejudicial as to deprive the defendant of a fair hearing. In *State v. Tippet*, 94 Iowa 646, 653, 654, we said that counsel "has a right, within reasonable limits, to draw his own deductions as to facts from other admitted or proven facts. * * * Inference of facts, from facts and circumstances actually shown, are permissible; and, unless such right is abused, or it is shown that the prosecutor has acted in bad faith, or has intentionally violated the rules applicable to arguments to the jury, and that such acts have prejudiced the defendant, we should not interfere."

Enough has been said in reference to the revolver, Exhibit B, to show that the statement of counsel for the State, that "this is his gun" was not an unwarranted inference. Doubtless, counsel for defendant did not permit the jury to forget that defendant was facing the gallows or prison walls. Defendant's character was presented in its most favorable light, both by his evidence and probably in argument. Enough is shown by the argument in this court to justify such an inference, if, indeed, it was not more favorably stressed before the jury: that his parents were dead; that he was industrious, and a good man, with some exceptions. No witnesses were introduced to show that defendant was a man of good character; but counsel say they had a right to rely upon a presumption that he was such, and that the State was not justified in attacking his character by referring to other offenses which the State claimed were connected with the killing, and other circumstances shown in the record. It is conceded by counsel for appellant that defendant was guilty of gambling,—the record shows, to a considerable extent,—and that he was immoral, as shown by having girls at his home. In addition to this, the jury could have found from the evidence

that he was guilty of a criminal offense on at least two occasions, in carrying concealed weapons. Under these circumstances, the presumption of good character is not very strong. The circumstances which were in the record were proper to be considered, as bearing upon the credibility of the defendant as a witness. The only remark in the closing argument for the State which was objected to was:

"Even though this man be innocent, he could not give his life in a better cause than to take punishment for the crime. If he goes to the gallows as an innocent man, and his going would create a disturbance that would cause the hundreds of boys and girls in Des Moines to see the light, and turn their steps towards sunlight instead of the night, he would wear a martyr's crown."

This may be thought intemperate. It was not boisterous or vicious. From the nature of the words used, it could not be so. In other portions of the same argument, counsel pointed out to the jury their responsibility, and stated, in substance, that it should rest its verdict and judgment on proven facts,— on those things that are shown in the record that are practically undisputed, and that point to the guilt of defendant; and that the jury should take its own judgment, and not his. Counsel did not ask or suggest to the jury that he be convicted if they thought he was innocent. He was claiming that, under the evidence, defendant was guilty. The statement, though not approved, was but another way of stating the necessity of protection of the public and the deterring effect upon others, and that the offense is grave in consequences, and that an acquittal should not be lightly brought about. *State v. Cameron,* supra, pages 381, 382. As said in the *Hasty* case, at page 519, if the crime was bitterly condemned, it may be said that the undisputed evidence as to the killing justified strong language. The opinion of the trial court is reflected in the record, when he stated that:

"The arguments for both the defendant and the State assumed a wide range of the discussion of the facts and the evidence; and some things, particularly in the closing argument for the State, might better have been left unsaid; but the arguments as a whole were calm and dispassionate. * * * Considering the arguments of both the attorney for the defendant

and the closing argument of the attorney for the State, the court is of the opinion that no prejudice resulted therefrom. * * * The whole trial was a most orderly proceeding, without an expression of approval or disapproval for either attorneys or anyone in the audience.''

There are cases holding that an argument may be so vicious as to show prejudice, and that a new trial may be granted even though no objection was made at the time. The other statements in argument are not of that character. The discussion of them is somewhat extended, and the opinion is already too long. The circumstances forbid a restatement of all the objectionable matter and the argument thereon.

We have given the case careful consideration, and we are satisfied from the record that the defendant is guilty, and that there is no prejudicial error. The judgment is—*Affirmed.*

Evans, C. J., Weaver and De Graff, JJ., concur.