STATE OF IOWA, Appellee, v. D. W. TAYLOR, Appellant.

**RAPE:** Evidence—Sufficiency. Evidence reviewed, and held to present 1 a jury question on the issue of rape.

**RAPE:** Corroboration—Circumstantial Corroboration. Defendant in a 2 prosecution for rape may furnish the necessary corroboration (1) by false statements as to his whereabouts at the time of the com-mission of the crime, (2) by false statements relative to incrimina-tory matters, (3) by efforts to prevent the officers from investigat-ing incriminatory matters, and (4) by efforts to conceal telltale articles.

**EVIDENCE:** Demonstrative Evidence—Incriminatory Articles. Record 3 held to show identification of certain incriminatory articles sufficient to justify their reception in evidence.

*Appeal from Polk District Court.*—LESTER L. THOMPSON, Judge.

MARCH 13, 1923.

REHEARING DENIED NOVEMBER 23, 1923.

DEFENDANT was convicted of rape, and appeals.—*Affirmed.*

*J. A. Dyer,* for appellant.

*Ben J. Gibson,* Attorney-general, for appellee.

PRESTON, C. J.—Three main points are relied upon by appellant for a reversal. First, he challenges the sufficiency of the evidence; second, he alleges that the corroboration is not sufficient; and third, he claims that the court erred in admitting, over objection, the revolver and handkerchiefs, because, as is argued, they were not sufficiently identified.

1. The defendant is 33 years of age. Prosecutrix is a young, married woman, 18 years old, who, at the time of the transaction, had a child 14 months old, who was with her. She was 7 or 8 months gone in pregnancy at the time. Her husband works for the railroad, as does the defendant. Defendant lives in the third house from that of prosecutrix and her husband, in Valley Junction. The houses are not far apart. The families were friendly, and had visited a few times, and had been acquainted for some months prior to the transaction, which occurred about 3 o'clock in the morning, March 2, 1921. No point is made by appellant that the jury could not have found that there was penetration and intercourse to some extent. The prosecutrix, Mrs. Kalberg, resisted as much as she dared. This being so, we shall not go into the details of this particular matter any more than seems to be necessary to cover other points. In addition to the matter just referred to, her testimony, briefly, is this:

"My husband goes to work about midnight. I undressed and went to bed about midnight. Was alone with the baby. Left the electric light in the room burning, because the fire was low, and wanted it to get started before turning out the light. I was awakened by the snapping out of the light. The door was not locked, but I thought I had locked it; turned the key half-way, and left the key in the door. Defendant came and put a flash light and gun in my face. Thought at first it was a burglar. Was frightened. He was standing beside the bed. He looked at me a long time; just stood and looked; got down close. The flash light was dim. After he bent down close, saw he had

a red and white bandana handkerchief over the lower part of his face. Could see his eyes. Recognized him as defendant by his eyes, and I knew his voice. He has a Southern brogue, and talks different. He told me to get up. I didn't get up right away, and he told me again to get up, and keep my mouth shut. I went to get up, and then began to cry, and he told me to turn my back, and pointed a gun at me while I was lying in bed. I finally got up, and he told me to turn my back and bend over. I put my hands on the bed. Turned around and saw what he was going to do, and pushed him away from me. He said he would blow my brains out if I didn't do as he told me. I was in fear of my life. Thought he would kill me. I went and done as he told me, after he threatened my life. I was so frightened I could hardly stand. Had never lived alone before. After defendant left, I tried to quiet the baby. Dressed myself and the baby without buttoning clothes or shoes, and, a few minutes after the transaction, went to the neighbors', Robbins, the next house east of us. Told Robbins someone had been in the house, and asked him to go for my husband. After Robbins had left, told Mrs. Robbins it was defendant. When my husband came, about 4 o'clock, I told him it was defendant. Defendant had on overalls. I have seen the gun, a small nickel-plated gun like the gun I had seen at Taylor's house. Do not know that this Exhibit A is the gun, but I know it was small like this, and had a shiny barrel,—nickel-plated. (Shown two handkerchiefs, B and C, bandana handkerchiefs. Says the man that was in her house that night had a handkerchief that color; it was folded that way.) I know defendant had a small flash light; it was nickel-plated; it threw a dim light. Defendant had intercourse with me for a while; penetrated my body. I begged him to leave me alone. Every time I would talk, he told me to shut my mouth; that he would blow my brains out if I moved, or didn't do what he told me,—and I believed he would. At first, he held the flash light in his left hand and the gun in his right. When I put my hands on the bed and bent over, I saw what he was going to do, and turned around and pushed him away. Don't know where the search light was then; it was dark. Don't know what he did with the gun. I know I pushed him away, then I turned around at the same place, and he tried to have inter-

course with me again. He abandoned that method. Then he turned me around. I was crying. I was afraid to scream. I first knew what he was going to do when he started to lift my nightgown; then I turned around and pushed him away. I was trying to get away from him all the time; didn't let him do just what he pleased with me.''

The Robbins testify as to what she said when she came to their house, and as to her condition, and that she was very nervous or excited.

The husband testified that, after defendant was arrested, and at the mayor's office about 11 o'clock the next forenoon, the officers told his wife, in the presence of defendant, that she ought to be certain before she accused this man, ''and I myself asked her many questions as to the possibility of mistaken identity, and she said she could not be mistaken.'' She accused defendant in his presence, and defendant denied the accusation.

The State's evidence is that, at that time, defendant begged to have the prosecution dropped, and offered to pay the costs. Defendant, testifying as a witness on this subject, qualifies somewhat the last statement, and says that the prosecutrix was willing to drop the prosecution, and that she was not certain that he was the party, and that the marshal asked him if he would pay the costs of the court if they dropped it, and he replied that he would, if they did not have the money.

Without going into further detail, it is enough to say that there is other evidence.

The evidence bearing more particularly on the question of corroboration, also on the identification of the handkerchiefs and gun, and the identity of defendant, is briefly this:

It is undisputed that defendant did not work at the roundhouse or yards, the night in question. He had been working steadily before that. He testifies that he telephoned the roundhouse about 10 o'clock, for permission to lay off, claiming that he had a headache. His work was from midnight until morning. A witness testifies to a conversation with defendant, in which defendant stated that he went to bed at 12:30, and was not out of his house thereafter during the night. Another witness testifies that he saw defendant and spoke to him about 3 o'clock the same night on the street, and that defendant was going towards

his own home, wearing a suit of overalls. Defendant denies meeting this witness.

The city marshal testifies that he arrested defendant about 11 o'clock in the forenoon of the next day. Defendant was in bed at his home, sleeping upstairs. Defendant came down and opened the door.

"Just had on his underclothes. I told him I had a warrant. I asked him if he had a gun. He said, 'Yes, down to the round-house.' Asked him if he had a flash light, and where it was, and he said, 'Some place in the drawers.' He commenced to go through them, but could not find it, so he said, 'I will go up-stairs, and be down in a minute.' I went up with him. He says, 'You don't need to; I will be down in a few minutes.' I went up, and the minute I got to the top of the stairs, I saw a flash light and a gun on a chair by the side of his bed. I took them and put them in my pocket. He dressed, and came down-stairs. There was a suit of overalls lying right there by the door. He went to take these red handkerchiefs out of the overalls, and I ordered him to leave them alone, and took them myself. Just the same as Exhibits B and C you show me. This dirty handkerchief seemed to be tied like tied in a knot, and one was folded up kind of square. One of them was folded in this position when found in defendant's pocket. This was wrinkled up like tied in a knot; both ends twisted. I turned these things and the flash light over to the mayor. The battery in the flash light was about burned out,—dim light. I gave that to the mayor, also. I took the overalls and handkerchiefs with me. The revolver you show me looks like the one I turned over to the court, and I turned it and the other exhibits over to the mayor. At the time of the arrest, defendant picked up the overalls and started to take something out of the pocket. He pulled out the handkerchiefs himself, and I told him to leave them alone."

The evidence introduced on behalf of the defendant tends to qualify and explain the State's evidence, and to show that he is not guilty. Defendant introduced evidence tending to show his good character. The State introduced a number of witnesses who say that his character is bad. This is the substance of the evidence. Clearly, it was a matter for the determination

of the jury as to defendant's guilt. The verdict is amply supported by the testimony.

2. We think that the evidence outside of that of the prosecutrix sufficiently points out the defendant, and tends to connect him with the commission of the offense, and that the evidence satisfies the statute as to corroboration.

2. RAPE: corroboration: circumstantial corroboration.

This may be shown circumstantially. The defendant's conduct when the marshal made the arrest; his statement that the revolver was at the roundhouse and the flash light in the drawer, when, as he knew, they were on the chair by the side of his bed; his effort to divert or prevent the marshal from going upstairs; his effort to remove the handkerchiefs from the overalls; the knotted, wrinkled, and folded handkerchiefs; the combination of the circumstances of finding the gun, the flashlight, the overalls, and the handkerchiefs, and the other circumstances before detailed; and the false statement by defendant that he had not been out of the house after 12:30 that night, and his being seen on the street about 3 o'clock, are significant. They show an attempt on his part to divert suspicion from himself. These circumstances,· covering the time when it is claimed he was at the home of prosecutrix, and the articles worn and used, indicate and are evidence of guilt. Evidence of guilt is necessarily corroboration. Such evidence tends to point him out and connect him with the offense. We have held that flight is evidence of guilt, and is corroboration, and may be sufficient. The same principle should apply here. In cases requiring corroboration of an accomplice, it has been held many times that suspicious conduct of defendant, flight, attempts to bribe a witness, misrepresentations, contradictions, contradictory statements as to whereabouts,. and the like, may be sufficient, and that it may be shown circumstantially. 16 Corpus Juris 705 to 708. We take it that this is so because these matters are evidence of guilt.

The circumstances above mentioned have a bearing, also, on the question of the identity of the defendant.

3. It is true, of course, that there are many red bandana handkerchiefs, revolvers, flash lights, and suits of overalls. No one can positively identify a revolver, probably, unless the num-

3. EVIDENCE: demonstrative evidence: incriminatory articles.

ber is taken. These articles were shown to be similar to those used in the home of prosecutrix, as she testifies. The finding of several articles of the same character in the defendant's home very soon after the crime is, as said, a combination of circumstances which is significant and quite persuasive. We think that the identification of the handkerchiefs and gun, and of the other articles, for that matter, was sufficient to permit their admission in evidence. See *State v. Browman*, 191 Iowa 608, 627.

We have examined the record with care, and find no reversible error. The judgment is—*Affirmed*.

EVANS, STEVENS, and FAVILLE, JJ., concur.